MICHAEL BAILEY
United States Attorney
District of Arizona
RAQUEL ARELLANO
Assistant U.S. Attorney
Arizona State Bar No. 011796
Evo DeConcini United States Courthouse
405 W. Congress Street, Suite 4800
Tucson, Arizona 85701
Telephone: 520-620-7300
Email: raquel.arellano@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CR 18-0263-TUC-JGZ (JR) |
| Plaintiff, | |
| vs. | GOVERNMENT'S MEMORANDUM REGARDING COMPETENCY |
| Robert Francis Krebs, | |
| Defendant | |

The United States of America, by and through its undersigned attorneys, hereby submits the following memorandum in support of its request that the Court determine that the defendant is competent to stand trial. Two hearings on competency were held on May 7, 2019, and May 24, 2019. A final hearing is scheduled for June 10, 2019.

**I.    Facts and Procedural History**

The defendant was arrested in Tucson, Arizona, on January 13, 2018, for a bank robbery committed on January 12, 2018. On February 21, 2018, the defendant was indicted by a federal grand jury for armed bank robbery, in violation of 18 U.S.C. Sections 2113(a) and (d). Per the criminal complaint filed on January 18, 2018, the charges stem from a bank robbery that occurred at a credit union located at 4491 North Oracle Road. (Doc. 1.) A black handgun (later determined to be a BB gun) was placed on the counter in front of a bank teller and an oral demand for money was made. A demand for money was made to a second bank teller, as well. Both tellers gave cash totaling approximately $8,384.84, some

of which was bait money. The robber wore no disguise and left the bank. Bank surveillance videotapes of the robbery depict a thin, elderly man wearing large brown-rimmed reading glasses and a sports coat. (Doc. 1.)

The following day, on January 13, 2018, the Tucson Police Department received information on the location of the subject fitting the description of the robber. The subject was arrested and later identified as 80 year-old Defendant Robert Francis Krebs. A search of his hotel room resulted in the discovery of approximately $7,500 and bait money. During a search incident to the defendant's arrest, a black BB gun, similar to the one exhibited during the bank robbery, was found in his bag. (*Id*.)

On January 23, 2018, the defendant provided a videotaped post-arrest statement to FBI agents. (Exhibit 7.) (The videotape of this statement was played to the Court at a hearing on May 24, 2019.) The defendant was informed of his *Miranda r*ights and agreed to read them aloud from a waiver form, which he signed. (Exhibit 8, Transcript, 1/23/2018 statement, Pages 6 - 7.) The defendant waived his rights and provided a lengthy, detailed statement (approximately 45 minutes in length). At the beginning of the interview, the defendant deliberately explained the correct spelling of his middle name "Francis" as being spelled with an "i" versus an "e", which is the feminine version. (*Id.* at Page 3.) The defendant stated his date of birth of 7/37, provided his residential and his mailing addresses, and social security number. (*Id.* at Pages 4 - 5.) With remarkable detail, he recounted that he had spent 17 years at the Arizona Department of Corrections (ADC) and that he ran the legal library and taught math in school. (*Id.* at Page 8.) He explained his specific incarceration locations at the ADC before being released in June 1, 2017, and being transported on a greyhound bus from Phoenix, Arizona, to Orlando, Florida. (*Id.* at Page 9.) He mentioned that he had instructions to check in with Florida probation within 72 hours. (*Id.)* He described in specific detail his horrible bus ride to Florida and arriving there around June 3rd or 4th. (*Id.* at Page 11.) He stated that upon arrival he got his first embolism attack and fell on the street, that an ambulance was called, and he then spent three days in a Florida hospital. (*Id.* at Pages 10 – 12.)

The defendant described in great detail his recollection of the events that happened around the time of the alleged bank robbery. He admitted that the bank and Tucson Mall surveillance photos were of him and that he committed the robbery because he needed money because his $800 a month in social security is not very much to live on these days. (*Id.* at Pages 12 – 13.) He recalled his actions prior to the alleged bank robbery, in that he selected a credit union because it was an easy robbery due to the lack of glass [separating the tellers and customers], the young bank teller girls, and the location which was just across from the Tucson Mall. (*Id.* at Page 14.) He explained that when he usually does a bank robbery, he looks at several different bank locations (and had even gone into the particular credit union before), before deciding which one would be the easiest for egress and no problems inside. (*Id.* at Pages 14 - 15.) He explained his decision to use a BB gun was for the simple reason to intimidate the tellers. He stated he had purchased the BB gun from the Walmart at El Con Mall several days before the robbery. He mentioned that on the day after the robbery, Walmart cleared out all of the BB guns from their shelf as if someone must have given them a heads up. (*Id.* at Pages 16 - 17.) He pointed out that there were a couple of men working at the bank, but he made sure they weren't there when he went in because one of them might be crazy enough to be carrying a pistol. (*Id.* at Page 18.)

The defendant specifically mentioned getting money from two tellers: "Two tellers, two counts." He specifically recalled that the two tellers were very close together and he had never seen two tellers that close together. (*Id.* at Pages 19- 20.) He noted that one teller was "older and more experienced…[a]nd she just gave me singles and crap." He "wanted to get in and out, because I had to cross Oracle…[a]nd Oracle is packed with traffic...at that time of day." He had remarkable recollection of almost getting struck while crossing Oracle Rd. by a vehicle that skidded and braked. (*Id.* at Page 21.) The videotape depicts the defendant seemingly amused while recounting that part. (Exhibit 7.)

He described going into the Sears store and retrieving a wheelchair that he had previously left at the optical department. He stated that he "knew once I made it to the

wheelchair, I would be okay." He recalled that he crossed Oracle Rd. by the fast-food restaurant McDonald's. (*Id.* at Page 22.) He figured he would go to the mall because if the SWAT team was called, they would have their hands full with all the people. When asked if he thought this through, the defendant stated "yeah" and that he is "very organized" and that it is his "nature" to be very organized. He added: "Every – everything I do is organized." (*Id.* at Page 24.) He described going to get the wheelchair at Sears. He recounted that he had previously gone into Sears and JC Penney's several times and looked to see how he "would get – egress into the mall the fastest." (*Id.* at Page 25.) He described getting the wheelchair and taking it to the men's room where he took off his tweed jacket, sweater, and maroon t-shirt that he had on over another set of clothing. He specifically recalled wearing dark blue with white Adidas exercise pants underneath his clothing. He purposely left his outer clothing there at the store. He stated he bought a pair of Adidas shoes to "get rid of all those one-dollar bills." (*Id.* at Pages 25 - 27.) He told the agents that he had previously worked as a bank manager and didn't think that he got more than $10,000. (*Id.* at Pages 28 - 29.) When asked why he didn't wear a disguise or a mask, he replied that he "kind of wanted to get caught" and "get back in prison". (*Id.* at Page 29.)

The defendant admitted that he had been having memory problems for 10 years, and had been diagnosed with onset of Alzheimer's, but that while he has "had trouble for probably ten years, I'm smart enough that I can camouflage it… [a]nd it's getting exponentially worse". (*Id.* at Page 30.) His goal was to get some place where he can find a niche as he doesn't recognize people or remember names. (*Id.* at Pages 30 – 31.) In discussing the bank tellers' reaction to the robbery, the defendant mentioned that he "treated them very politely" and that "if they're really terrified, if they don't – I think that if they don't have to go to court, they'll be okay." (*Id.* at Page 32.) He added that he wouldn't want one of his female family members working in a bank because "[i]t's dangerous" and recalled that the "younger girl was scared." (*Id.* at Pages 33 - 34.)

On March 28, 2018, clinical neuropyschologist Dr. Marisa Menchola, Ph.D., completed a "semi-structured assessment of competency to stand trial" and a "semi-

structured evaluation of mental state" regarding the defendant's competency. (Exhibit 5, Dr. Menchola's forensic evaluation report, at Page 1.) The report does not indicate what reports or collateral information were reviewed as part of her evaluation, other than medical and mental health records she received from ADC. The defendant informed the doctor that after graduating from high school he took college courses in the United States and in Mexico. He reported that his main occupation was working as an investigator. He stated that he stopped working when he became incarcerated in 1980, although he taught math while in prison. Dr. Menchola's review of ADC records revealed that the defendant was never diagnosed with a learning disability and did not receive special education. Per her report, those records revealed that the defendant completed two years of college in Calgary in 1973-1974. *(Id.)* The records revealed that the defendant worked as a self-employed "criminal, legal, insurance, [and] credit" private investigator, and that he became a state-certified law clerk while in prison in the Florida Department of Corrections. (Exhibit 5, Page 2.)

Dr. Menchola's "Medical History" section of her report notes that the defendant reported a history and diagnosis of "pulmonary embolisms" in December, 2017. (*Id.*) Defendant reported multiple concussions and one head injury with loss of consciousness. He reported a history of heart problems and "atrial fibrillation". He reported progressive memory problems and a previous diagnosis of "Alzheimer's onset". He mentioned that various relatives had the disease. He reported that he was taking an anticoagulant and another medication for neuropathy. Medical records from ADC indicated that the defendant was diagnosed with atrial fibrillation in 2012. The defendant reported to the doctor that he suffered head injuries in 1995 and 1998.

Dr. Menchola reported that the defendant's speech was slow, but was understandable for the most part and articulate. "Language comprehension was grossly normal; he had no difficulty understanding questions or test instructions." (Exhibit 5, Page 4.) "He was only partially cooperative during assessment of competence; he seemed guarded and repeatedly refused to answer questions about his case specifically and the legal

system more generally." (*Id.*) Dr. Menchola noted in the "Cognitive Functioning" section of her report that the defendant's "[m]emory functions and the executive ability to initiate responses were severely impaired." She concluded that "[g]iven his impaired performance on this task, his severe hearing impairment, and his reported visual impairment, no other neuropsychological tests were administered."

However, in the "Assessment of Competency to Stand Trial" section of her report, Dr. Menchola made noteworthy references to information gleaned from the defendant about the legal system, such as that: he knew his charge was "bank robbery"; the specific allegations were that he robbed a bank in January, 2018; his charge is a felony; felonies are more serious than misdemeanors; his plea options are "guilty or not guilty"; a guilty plea means that a defendant is "saying he did it"; after such a plea "[y]ou're penalized someway"; and that with a not guilty plea a defendant is stating that "[t]hey didn't do it." (Exhibit 5, Pages 4 – 5.) Concerning the roles of the parties involved in the legal process, the defendant stated that the judge "makes the decision" of "guilty or not guilty." When asked what the defense attorney does for him, he replied, "[w]hat a defense attorney is supposed to do, defend." When asked what specific things defense counsel does for a defendant, he replied, "[i]t depends." When asked about the role of a prosecutor, the defendant replied, "[a] defense attorney defends. A prosecutor prosecutes." He stated that a jury "[d]ecides guilt or not" and that witnesses "testify" about "what happened." He stated that the "judge" is in charge of the court, the "prosecutor" brings the charges against the defendant, and "[y[our attorney" speaks for the defendant in court. (*Id.* at Page 5.) When the doctor asked the defendant about the nature of plea agreements, the defendant stated "[a]ll this court stuff, I'd rather not talk about it." When the doctor pressed on about it, the defendant stated "I don't know." According to the doctor's report, the defendant did express an awareness that accepting a plea agreement is an alternative to taking a case to trial. However, when the doctor asked the defendant why a defendant might choose one over the other, the defendant replied, "I really don't want to talk about this, except with the attorney." When the doctor asked the defendant what happens at trial, he stated "[a]ll this

business about trials, I don't want to talk about it." When the doctor explained to the defendant that she wanted to hear what his general understanding of the system and legal options were, he stated, "I'm happy to answer your questions but all this court business I don't want to discuss." (*Id.*)

The defendant stated that although he did not know his attorney's name, he knew that his first name is "Leo". He did not express delusional beliefs regarding the court or his attorney during the evaluation. When the doctor asked the defendant about the evidence in his case, he replied, "[c]an't talk about that" because "[i]t's confidential." The defendant said that he was not able to recall what happened around the time of the allegations. He did not answer questions meant to assess his rational understanding and decision-making. (*Id.*)

Dr. Menchola noted in the "Diagnostic Impressions" section of her report: "Unspecified major neurocognitive disorder (dementia), mild," however, she concluded and opined that "[n]europsychological assessment revealed a pattern consistent with the advanced early stage of a major neurocognitive (dementia), with severe impairment memory." (Exhibit 5, Pages 5 – 6.) She opined that the defendant's cognitive profile based on testing is consistent with both mild Alzheimer's disease and mild vascular dementia. Dr. Menchola noted that the assessment of competency to stand trial was limited by the defendant's refusal to answer many questions. (*Id.*) She acknowledged that although there are significant limitations to the evaluation, due to the defendant's presentation and performance on testing, she concluded that the defendant was incompetent to stand trial due to a major neurocognitive disorder (dementia) causing severe impairment in memory, executive functions (primarily the initiation of speech and behavior) and cognitive processing speed. She ultimately concluded that the defendant was unrestorable to competence. She did not list what standardized assessment of global cognitive functioning was administered nor details of the testing.

Following this evaluation, the Court ordered that the defendant be evaluated by a licensed or certified psychiatrist, Dr. Bradley R. Johnson, M.D.. (Doc. 36.) Dr. Johnson evaluated the defendant on August 15, 2018. (Exhibit 6, Dr. Johnson's forensic evaluation report, Page 1.) He concluded that the defendant was competent to stand trial and was malingering. (*Id.*) He also diagnosed the defendant with an anti-social personality. The defendant was uncooperative during the evaluation. The defendant refused to participate by answering any of the doctor's questions. He turned his head to the side and never spoke. He refused to answer who he was, where he was, or why he was there. (*Id.* at Page 4.) The doctor attempted multiple times to engage the defendant, but it was obvious to the doctor that the defendant was refusing to or was unable to cooperate. (*Id.*) The doctor stepped out into the hallway to ask the officers who transported the defendant what their interaction with the defendant had been like during the transport. They told the doctor that the defendant had conversation with them and had even asked them to stop and allow him to go to the bathroom. *(Id.)* Dr. Johnson specifically noted that although the defendant was able to communicate with the officers, the defendant "turned his head and seemed to refuse to cooperate with any questioning when [the doctor] attempted to evaluate him." *(Id.* at Page 5.) Concerning this uncooperative behavior, Dr. Johnson explained that there was "no psychiatric reason that [the defendant] would be unable to look directly at me and at least attempt to answer questions" and that "[d]ementia does not present in this manner, coming and going in its symptomatology, but rather is something that comes on gradually with the defendant's losing memory or abilities slowly over time, or in a downward, step-like fashion [and that] [p]eople with dementia, especially when mild in nature, are able to answer questions and attempt to participate." *(Id.)* The doctor went on to explain that "[i]t would be unusual for [one with dementia] to present where they are fully cooperative and able to give a great deal of detail and answer all questions without difficulty, and then at another time be unable to speak or be so confused that they cannot answer questions." *(Id.)* Notably, the doctor opined that this type of presentation is more likely consistent with "an exaggeration of [the defendant's] abilities, or in other words, malingering, to present himself as having substantially worse problems than he has in actuality." The doctor

opined that even if the defendant "has some memory problems, [the doctor] was not convinced, based on the information presented … that his memory problems are severe to the degree that he is unable to cooperate with a line of questioning, including questions about his own case." The doctor's report highlighted the information Dr. Menchola obtained from the defendant pertinent to a competency evaluation relating to the defendant's understanding of the legal system. *(Id.* at Page 6.)

Dr. Johnson reviewed eleven sources of information, all listed on the first page of his report, including the January 23, 2018, videotaped statement of the defendant, numerous surveillance videos of the Tucson Mall and Sears store depicting the defendant's movements, and Dr. Menchola's report. He concluded in his September 3, 2018, report that the defendant is malingering and is competent to stand trial. (Exhibit 6, Pages 5 - 6.)

Thereafter, on September 14, 2018, the Court ordered the defendant be hospitalized in a suitable facility and be evaluated by a licensed or certified psychiatrist or psychologist to determine whether the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense. (Doc. 41.) The defendant underwent evaluation at the Federal Medical Center (FMC) in Butner, North Carolina, from October, 2018, through February, 2019. (Exhibit 2, Dr. Robert Cochrane's forensic evaluation report, Page 1.) There, he was observed at length and interviewed by forensic psychologist Dr. Robert E. Cochrane and his staff. The conclusion reached was that the defendant is competent to stand trial and was diagnosed as malingering. (Exhibit 2, Pages 5 and 7.) A certificate of restoration of competency to stand trial was issued by FMC certifying that the defendant is able to understand the nature and consequences of the proceedings against him and to assist properly in his own defense. (Exhibit 3.)

At the two status/evidentiary hearings held on May 7, 2019, and May 24, 2019, Dr. Cochrane testified consistent with his report, concluding that the defendant is competent to

stand trial and is malingering. According to Dr. Cochrane's report dated March 6, 2019, upon admission to Butner, the defendant underwent a routine physical examination and laboratory studies. (Exhibit 2, Page 2.) The labs were unremarkable. During the exam, the defendant revealed a "history of atrial fibrillation, pulmonary embolism, osteoarthritis, and congestive heart failure, and memory decline." The doctor noted that given the defendant's reported problems with memory impairment, an MRI brain scan was completed on October 22, 2018. (*Id*.) The report noted that the radiologist indicated there were no acute intracranial abnormalities (i.e., normal volume loss, no hydrocephalus, no mass effect or midline shift).

The report noted that the defendant was initially housed in a mental health transition unit for closer observation, however, after about a week, the staff reported that the defendant was functioning much higher than other patients on the unit. (Exhibit 2, Page 3.) The defendant was subsequently transferred to an open unit where he remained and was observed throughout his four months at Butner.

The defendant was referred to a weekly class called the Competency Restoration Group, whereby defendants are taught about the U.S. legal system, but the defendant never attended. The defendant initially stated that he could not find the room where the group was located, but when the doctor explained how to ask staff for assistance and notified the instructor that the defendant may need help finding the room, the defendant declined to attend any of the classes. (Exhibit 2, Page 4.) He stated that he was "not capable of understanding anything that was taught." (*Id.*).

It is worth noting that during clinical interviews at Butner, the defendant frequently commented about having severe cognitive impairment by stating "I can't understand what people are telling me…" and "I can't understand one word they say in court." (Exhibit 2, Page 4.)

The staff attempted to administer certain psychological tests, but the defendant refused. The Montreal Cognitive Assessment (MoCa) test was attempted to test his

- 10 -

memory, but the defendant stated that he was "too confused… I can't do it." He said he has good days and bad days, but that his memory was getting worse. *(Id.)* The Shipley and VIP tests were attempted, however the defendant stated he could not complete the tests and that he "gets confused." (Exhibit 2, Page 4.) Yet, the defendant understood all of the doctor's questions and smiled appropriately when the doctor made a small joke. *(Id.)*

The evaluation report notes that throughout the defendant's stay at Butner, the staff reported no concerns with the defendant's behavior and that he related well with others. (Exhibit 2, Page 5.) One unit nurse noted that the defendant was the first person in line for medications in the morning and would even read a book while waiting. (*Id.*).

Dr. Cochrane concluded that based on several months of observation, clinical interviews, and review of records, the defendant "embellished or grossly exaggerated deficits to avoid criminal prosecution." (Exhibit 2, Page 5.) The doctor listed in his report several factors that contributed to his diagnosis of malingering. (Exhibit 2, Page 6.) The first factor listed is that the defendant's functioning is much higher than one would expect for someone with dementia or severe cognitive impairment. He noted that these patients will almost always attempt and be able to complete simple questions on psychological tests. The doctor explained that these patients are asked simple tasks such as to recite the alphabet or give the date of birth. The defendant stated he could not complete the testing. (Exhibit 2, Page 4.) Yet, upon admission at Butner, the defendant reported that his true date of birth is 7/37 and that the date of birth in BOP records is incorrect. (Exhibit 2, Page 1, Fn. 1.) Moreover, the defendant handed the doctor a handwritten note (Exhibit 4), presumably written by the defendant, that listed information regarding the defendant's stay at ADC. The note contains the name of a "Tom Lyerla," an ADC employee that U.S. Pretrial Services spoke with as noted on Page 5 of Pretrial Services' report. (Doc. 5.) The note is legible. (Exhibit 4.)

Dr. Cochrane acknowledged that although the defendant did not fully cooperate with the assessment of his competency or answer questions about his understanding of

- 11 -

court proceedings, the doctor opined that "there is no convincing evidence he suffers from a mental disorder that would render him mentally incompetent." (Exhibit 2, Page 6.) The doctor noted that during the police interview, the defendant communicated clearly and appeared to understand his legal situation. (*Id.*) Although the doctor did not have the taped statement to review, he noted that Dr. Johnson had reviewed it. The doctor made this observation about the defendant: "If he is so motivated, I cannot see why he could not work effectively with his attorney to defend himself." The doctor opined that the defendant's "current functioning is such that he could aid in challenging adverse witnesses, attend to courtroom procedures, and testify if necessary." (*Id.*)

The Butner staff assigned a principle diagnosis of malingering and concluded that the defendant was competent to stand trial. (*Id.*)

**II.     Law**

A defendant is competent to stand trial if he is able "to understand the nature and consequences of the proceedings against him" and to "assist properly in his defense." 18 U.S.C. § 4241(e). The standard for the Court's decision is a preponderance of the evidence. (*Id.*) In *Dusky v. United States*, 362 U.S. 402 (1960), the Supreme Court phrased the standard for competency as "whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding-and whether he has a rational as well as factual understanding of the proceedings against him." The Ninth Circuit has continually used the language in *Dusky* as the standard for determining whether defendants are competent to stand trial. It "has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense, may not be subjected to trial." *Bills v. Clark*, 628 F.3d 1092 (9th Cir. 2010) citing *Drope v. Missouri*, 420 U.S. 162, 171-72 (1975); *See United States v. White*, 670 F.3d 1077, 1082 (9th Cir. 2012); *Miles v. Stainer*, 108 F.3d 1109, 1112 (9th Cir. 1997). A court considers relevant evidence: medical history, a defendant's behavior in and out of court, and defense counsel's statements about his/her client's competency. *United States v. Garza*, 751 F.3d

1130, 1133 (9th Cir. 2014) citing *United States v. Marks*, 530 F.3d 799, 814 (9th Cir. 2008).

Even when the accused suffers from mental illness they may still be sufficiently competent to stand trial. "In cases finding sufficient evidence of incompetency, the petitioners have been able to show… lengthy histories of acute psychosis and psychiatric treatment…" *Boag v. Raines*, 769 F.2d 1341, 1343 (9th Cir. 1985) (citing *Moore v. U.S.*, 464 F.2d 663, 665 (9th Cir. 1972) where defendant, who had been repeatedly hospitalized for acute mental illness and hallucinations, was deemed incompetent). In *Boag v. Raines,* the defendant was diagnosed by prison staff as a sociopath; a diagnosis the court found of little importance in determining his competency to stand trial because the illness had no bearing on his ability to understand the legal proceedings or consult with his attorney. The court found that despite the defendant's history of mental illness, five attempted suicides, repeated head injuries, stories of bizarre behavior, and diagnosis as a sociopath, there was not a substantial doubt as to Boag's competency. (*Id.*) The Eleventh Circuit has reasoned along the same lines. "[N]ot every manifestation of mental illness demonstrates incompetence to stand trial; rather, the evidence must indicate a present inability to assist counsel or understand the charges… Similarly, neither low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial." *Medina v. Singletary*, 59 F.3d 1095, 1107 (11th Cir. 1995).

Suffering from a mental defect or illness does not constitute incompetency when it fails to meet that test described in *Dusky.* However, un-contradicted testimony regarding a defendant's mental illness by multiple witnesses has been a factor in finding a defendant incompetent. In *Pate v. Robinson,* 383 U.S. 375 (1966), the trial court was not justified in ignoring un-contradicted testimony of the defendant's "history of pronounced irrational behavior" when it found him competent to stand trial. Four undisputed witnesses testified to frequent occasions over the course of the defendant's life where he displayed insane behavior. *Pate* at 378. This behavior escalated to the point of murder and attempted suicide. *Id.* at 379. At the time of trial, Pate displayed no sign of mental illness, the trial court made its competency determination on that evidence, and ignored the testimony of

his past behavior.

**III. Analysis**

In this case, all competent medical evidence before this Court indicates that the defendant is competent to stand trial. Even if the defendant, given his age, may be suffering from some form of mild dementia or Alzheimer's and some physical medical conditions which require management, they are not so severe or to the degree where the defendant would be rendered incompetent. The psychiatrist, Dr. Johnson, reached this conclusion. (Exhibit 6, Page 6.) The defendant is capable of assisting his attorney at trial, if that is the direction he chooses to go, and this includes giving testimony. Given all of the evidence presented to the Court, including the police reports, taped statement of the defendant, the various forensic evaluations, the complaint filed in this case, and U.S. Pretrial Services report, there is no credible support for an argument that the defendant is somehow unable to testify, or otherwise assist his attorney.

At the evidentiary hearings held on May 7, 2019, and May 24, 2019, Dr. Cochrane testified consistent with his forensic evaluation report that the defendant is presently able to consult with counsel and have a factual understanding of the proceedings against him. (Exhibit 3.) Dr. Cochrane's diagnosis is that the defendant is malingering and is suffering from an anti-personality disorder. (Exhibit 2, Page 5.) Significantly, the defendant was observed and evaluated by FMC Butner staff for a substantial period of time beginning in October, 2018, through February, 2019, for them to reach their conclusions regarding competency. Just two months prior to the defendant undergoing evaluation at FMC Butner, psychiatrist Dr. Johnson evaluated the defendant and also concluded that the defendant was competent to stand trial. He, too, diagnosed the defendant with malingering and anti-social personality. FMC Butner has not diagnosed the defendant with a mental illness that would impair his ability to consult with counsel, or understand the proceedings against him. The FMC Butner's evaluations note that a diagnosis of malingering could indicate that the defendant may be doing so to avoid criminal prosecution. (Exhibit 2, Page 5.) Concerning the issue of memory impairment, the FMC Butner evaluation report states that basic

questioning was conducted that would reveal basic information typically retained by demented and intellectually impaired individuals. The defendant claimed that he could not recite the alphabet nor did he know the current date and year. (Exhibit 2, Page 5.) The defendant would not even answer those basic questions, yet he provided a perfectly legible handwritten note to the doctor concerning the defendant's prison time at the ADC. (Exhibit 4.) Given the defendant's clear and explicit statements made in his post-arrest taped interview –including his admission that although he has had memory problems, he is smart enough to camouflage or cover up when he struggles with his memory— the defendant is competent to stand trial and may be malingering as the doctors noted. (Exhibit 6, Page 5.) Any inability to communicate with his attorney would be the result of the defendant's unwillingness to assist.

**IV. Conclusion**

On the record before the Court, the government submits that it has met its burden to prove that the defendant is competent to stand trial. The finding of malingering identified by Dr. Johnson and confirmed by the FMC Butner evaluation point to mental defects insufficient to render the defendant incompetent to stand trial. The government respectfully requests that the Court find the defendant competent to stand trial.

Respectfully submitted this 7th day of June, 2019.

MICHAEL BAILEY
United States Attorney
District of Arizona

*s/Raquel Arellano*

RAQUEL ARELLANO
Assistant U.S. Attorney

Copy of the foregoing served electronically or by
other means this 7th day of June, 2019, to:

Jorge Leonardo Costales, Esq.
Gregory Jon Berger, Esq.