1
2
3
4
5
6

IN THE UNITED STATES DISTRICT COURT

7

FOR THE DISTRICT OF ARIZONA

8
9

United States of America,

CR18-00263-TUC-JGZ(JR)

10

Plaintiff,

**REPORT & RECOMMENDATION**

11

vs.

(Pursuant to: 18 U.S.C. § 4241)

12

Robert Francis Krebs,

(Defendant in Custody)

13

Defendant.

14
15
16

On February 21, 2018, the Defendant was indicted and charged with one count of

17

Armed Bank Robbery in violation of 18 U.S.C. § 2113(a) and (d).  DOC 8.[1]  Before the

18

Court is Defendant's Motion to Determine Competency. DOC 27. The Court has

19

considered the moving papers, reports, and hearing testimony, and recommends that the

20

District Court find that the Defendant is competent to stand trial and to assist his counsel.

21
22

/ / /

23

/ / /

24

/ / /

25
26
27
28

[1] The Court will use "DOC" to refer to the court docket, "EX" to refer to the exhibits
admitted at the hearings and "TR" to refer to the transcripts of the evidentiary hearings.

1

2

## I.      History of the Case

### A.      Complaint (DOC 1)

The Complaint, which was filed on January 18, 2018, alleges that on January 12, 2018, the Defendant entered the Pyramid Federal Credit Union in Tucson carrying a black messenger bag.  He approached the bank teller and pulled out a smaller black bag from the larger messenger bag and put it on the teller's counter.  The Defendant demanded that the teller give him all the money and not sound any alarms.  He placed a black handgun (later determined to be a BB gun) on top of the small black bag with the handgun pointed at the bank teller's torso.  The teller gave him $4,259.50.  The Defendant then moved to the next bank teller and did the same.  That teller gave him $4,125.34.  In total, the Defendant is charged with robbing $8,384.84.  He left the bank and was arrested the following day by the Tucson Police Department.

### B.      Videotaped Post-Arrest Statement (EXS 7-8)

The Defendant was interviewed by FBI Special Agents Keefe and Livingston on January 23, 2018.  EX 7.[2]  The interview lasted approximately 45 minutes.  EX 8.  It began with the Defendant providing detailed information about himself, including the spelling of his middle name, his date of birth, the approximate number of people in his home town, his mailing address, his residence address and his social security number.  EX 8, 3- 6.  He spoke in detail about prison life, where he served time and how he was transported to the

---

[2] The videotape was played to the Court on May 24, 2019.

various prisons.  EX 8, 8-11.  He recounted that he had spent 17 years at ADC (the Arizona Department of Corrections) where he taught math and ran the legal library.  EX 8, 8.  He described his physical ailments and his hospital stay (EX 8 10-12) and that he had been diagnosed with onset Alzheimer's (EX 8, 30).  According to the Defendant, he had been having trouble with it for ten years although he was smart enough to camouflage it, but it was getting exponentially worse.  EX 8, 30.  He said he didn't recognize people and could not remember names.  EX 8, 31.  He was, however, able to meticulously explain how he planned and carried out the robbery, what he was wearing and what he did before and after leaving the bank.  EX 8, 12-29.

Interestingly, the Defendant stated that he didn't wear a disguise or a mask during the robbery because he wanted to get caught.  EX 8, 29.  He wanted to go back to prison where he didn't have to contend with what's going on in the outside world with cell phones and everything else.  EX 8, 9-30.  He also admitted that the reason he committed the robbery was because he needed money as his $800 per month social security was not much to live on. EX 8, 13.  That was why he didn't change his name or appearance.   EX 8, 34.  He wanted to find a niche as he didn't recognize people.  EX 8, 30.  He explained that the last seven months were the worst in his life as he tried to adjust to life on the outside.  EX 8, 34.

C.      **Pretrial Report (DOC 5)**

The Defendant's felony conviction record is set out in the pretrial report that was prepared shortly after his arrest.

- In 1966, when the Defendant was 24 years old, he was convicted in Chicago of bank embezzlement and was sentenced to three years in prison;

- In 1967, at age 24, he was convicted in New York of felony grand larceny and sentenced to one year in prison;

- In 1973, at age of 31, he was convicted in Canada of extortion and sentenced to 4 years in prison;

- In 1980, at age of 38, he was convicted in Tucson of theft and sentenced to 20 years in prison;

- In 1981, at age 39, he was convicted in Florida of robbery and kidnapping and sentenced to 75 years in prison; and

- In 1988, at age 46, he was convicted in Tucson of robbery and sentenced to 28 years in prison.

The Defendant was released from prison on June 1, 2017. He was paroled to Florida and absconded in November of 2017. He was charged in Tucson with armed bank robbery on January 18, 2019.

**D.   Tucson Court Matters**

On July 24, 2018, defense counsel filed a Motion to Determine Competency. DOC 27. On March 28, 2018, Defendant was evaluated by a local clinical neuropsychologist, Marisa Menchola, Ph.D. EX 5. In her report dated July 12, 2018, Dr. Menchola concluded that the Defendant was not competent to stand trial due to a major neurocognitive disorder (dementia) and that the Defendant was not likely restorable to competence.

On August 15, 2018, Defendant was evaluated by a local medical psychiatrist, Bradley Johnson, M.D. EX 6. In his report dated September 3, 2018, Dr. Johnson

concluded that the Defendant was competent to stand trial and that his presentation was more likely consistent with malingering.

At a Status Conference on September 13, 2018, both parties agreed that an additional evaluation was needed in a medical facility where the Defendant could be evaluated over a longer period.  DOC 40.  Defendant was hospitalized at the Federal Medical Center in Butner, North Carolina where he was evaluated by a forensic psychologist, Robert Cochrane, Psy.D.  EX 2.

In his report dated March 11, 2019, Dr. Cochrane concluded that there was no convincing evidence that the Defendant suffers from a mental disorder that would render him mentally incompetent.  He also found that the Defendant was malingering and noted that his personal and criminal history was more consistent with a finding of antisocial personality disorder.

Competency hearings were conducted on May 7, 2019, May 24, 2019, and June 10, 2019.  DOCs 55, 59, 66.  Defendant was present and represented by counsel.  Seven exhibits were admitted at the first hearing.  One exhibit was admitted at the second hearing.  One witness, Dr. Cochrane, testified via video conference at the first two hearings.  The Defendant testified at the last hearing.[3]  The attorneys filed supplemental memorandum on June 7, 2019 (DOCs 64, 65) and presented oral argument at the hearing on June 10, 2019.

---

[3] In accordance with *United States v. Gillenwater*, 717 F.3d 1070 (9th Cir. 2013), the Court gave the Defendant an opportunity to testify.  He declined to testify at the first two hearings but did testify at the last one.

## II.     Forensic Evaluations

### A.     Dr. Menchola (EX 5)

Defendant was seen on March 28, 2018 by Dr. Menchola.  She described the Defendant as alert but exhibiting difficulties with his speech.  He spoke very slowly, with very long latencies between the question and his answer, and for the most part, provided very short answers.  He was however, able to provide many details about his social, occupational, medical, substance abuse and psychological history.  As the interview progressed, Defendant was less cooperative.  He refused to answer many questions relating to his charges.  Dr. Menchola noted that her assessment was limited because of that.

Much of the Defendant's medical and psychological history was self-reported. Notes from a 2010 document revealed that the Defendant complained of memory deficits, word-finding ability and concentration problems.  He was worried about dementia and claimed to have been diagnosed with the onset of Alzheimer's.  He reported a significant mental health family history.  He stated that his grandfather, father and father's twin brother had Alzheimer's.  He said his mother and sister died by suicide and another sister was disabled due to a suicide attempt.   Records from 2003 to 2012 included a diagnosis of major depression, bipolar disorder and antisocial personality disorder.   Records also described the Defendant as having a history of excessive mood swings, violence and feigning/manipulation but no psychosis.

With respect to the Defendant's factual knowledge of the charges and the legal system, Dr. Menchola explained that the Defendant knew that he was charged with bank robbery and that it was a felony.   He knew that felonies are more serious that

misdemeanors.  He knew his plea options and the role of a judge, jury and attorney.  The Defendant did not express any delusional beliefs or other disruptive behavioral symptoms that would interfere with his ability to cooperate with counsel.  He knew who his attorney was but would not talk about the evidence in his case as it was "confidential."

Dr. Menchola was able to perform a standardized assessment of global cognitive functioning test.  The Defendant performed in the severely impaired range.  Given his performance on this test as well as his reported severe hearing and visual impairments, no other neuropsychological tests were administered.  Based on this one exam, Dr. Menchola reported that the neuropsychological assessment revealed a pattern consistent with the advanced early stages of dementia, with severe impairment in memory and aspects of executive functioning, milder deficits in visuospatial functions, and relatively preserved attention and reasoning.

Noting that there were significant limitations to her evaluation, Dr. Menchola concluded that based on the Defendant's presentation and performance on testing, it was her opinion that he was not competent to stand trial due to a major neurocognitive disorder-dementia.  She further concluded that even if his cognitive status remained stable, he would not be restorable to competence.

**B.    Dr. Johnson (EX 6)**

Defendant was seen on August 15, 2018 by Dr. Johnson.  From the start of the evaluation, the Defendant refused to cooperate.  Dr. Johnson attempted to engage him for 10 to 15 minutes, but he turned his head to the side and never spoke.  He would not even provide historical data about his background.  He had poor eye contact and moved very

little while sitting in his wheelchair.  After multiple attempts to engage the Defendant, it was obvious to Dr. Johnson that he was not going to cooperate.  Dr. Johnson went out into the hallway to ask the officers who brought him to the evaluation what their interactions with him had been.  The officers stated that he had been conversant with them, even asking that they stop and allow him to use the restroom.

Due to the Defendants uncooperativeness, Dr. Johnson was not able to assess his thought process, so he looked to collateral sources.  Based on the Defendant's significant legal and criminal history, Dr. Johnson opined that the Defendant has antisocial personality disorder.  He found no psychiatric reason why the Defendant would not be able to look directly at him and at least attempt to answer questions.  He stressed that dementia does not present in that manner, coming and going in its symptomatology.  Rather, it is something that comes on gradually; a person will lose their memory or ability slowly over time, or in a downward, step-like fashion.  People with dementia can answer questions and attempt to participate.  While a person with dementia may have good and bad days, it is unusual for them to be fully cooperative on one day and on another day, be unable to speak or be so confused that they cannot answer questions.  According to Dr. Johnson, Defendant's presentation was more likely consistent with an exaggeration of his abilities or outright malingering.

Dr. Johnson concluded that the Defendant was competent to stand trial.  Even if he had some memory problems, Dr. Johnson did not believe they were severe enough that he wasn't able to cooperate.  Recognizing that Dr. Menchola came to the opposite conclusion, Dr. Johnson stated that it was possible that Dr. Menchola did not have the liberty of

reviewing as many collateral sources, including the videotaped statement the Defendant provided the FBI on January 23, 2018.

### C.    Dr. Cochran (EX 2)

Defendant was admitted to the Federal Medical Center (FMC) in Butner, North Carolina on October 17, 2018.  After the evaluation period, Dr. Cochran submitted his report on March 19, 2019.  Dr. Cochran reported that upon his admission, Defendant complained of numerous physical problems as well as memory decline.  Given his reported problems with memory impairment, an MRI brain scan was completed on October 22, 2018.  The MRI indicated no acute intracranial abnormalities.

During clinical interviews, Dr. Cochrane reported that the Defendant deflected questions, stated he could not comprehend what others were telling him and had trouble with confusion.  Dr. Cochrane attempted to conduct three psychological tests, but the Defendant insisted that he could not complete them.  The Defendant was referred to a Competency Restoration Group but declined to attend the group, stating he was not capable of understanding anything that was taught.

Based on several months of observation, clinical interviews and a review of records, Dr. Cochrane concluded that the Defendant did not suffer from a mental illness or cognitive impairment.  Dr. Cochran diagnosed the Defendant with antisocial personality disorder and malingering.  Dr. Cochrane noted six factors that contributed to his finding of malingering. They were:

1.    His functioning is much higher than one would expect for someone with dementia or severe cognitive impairment.  These patients will almost always attempt and be able to complete simple questions on psychological tests.

2. Mr. Krebs was deceitful about having a guardian, trying to appear impaired and disabled.

3. The recall and cognitive abilities he demonstrated during interviews did not comport with claim of having grossly impaired memory and thinking.

4. He did not know rudimentary and overlearned information that demented, TBI [traumatic brain injury], and stroke patients typically retain.

5. As Dr. Johnson noted in his report, on 01/23/19 Mr. Krebs provided a detailed version of events.  He has not suffered a stroke, traumatic brain injury, or another significant event since then that would explain him now being amnestic.

6. MRI brain imaging did not show any clear evidence of organic impairment.  His labs were also essentially normal and there was no other biological evidence supporting gross impairment.

EX 2 at 6.

  With respect to his opinion that the Defendant suffered from antisocial personality disorder, Dr. Cochrane explained that the disorder is characterized by a pervasive pattern of disregard for, and violation of, the rights of others that begins in childhood or early adolescence and continues into adulthood.  Due to the Defendant's lack of cooperation, Dr. Cochrane was not able to fully assess some of his traits, but his behavior suggested that he led a lifestyle of deception (e.g., aliases), irresponsibility (not supporting children he has fathered), violence, and varied criminal activity.  Dr. Cochrane concluded that these character traits are not considered a mental illness and have no bearing on competency to stand trial.

  If motivated, Dr. Cochrane opines that the Defendant can work effectively with his attorney.  He can listen and respond clearly and relevantly to questions and his current

- 10 -

functioning is such that he can aid in challenging adverse witnesses, he can attend to courtroom procedures and if necessary, he can testify.  Dr. Cochrane concluded that the Defendant understands the nature and consequences of the proceedings against him and can assist properly in his defense.

## III.     Hearing Testimony

### A.     Dr. Cochrane

Dr. Cochrane first met the Defendant when he was admitted to the Butner facility on October 17, 2018.  TR 13.  From October of 2018 until February of 2019, he estimates that he had six to eight sit-down full-length interviews with the Defendant, each lasting about 45 minutes to an hour.  TR 57, 104, 117.  He also saw the Defendant several other times in passing.  TR 57.

At this first interview, as he does with all new admits, Dr. Cochrane discussed with the Defendant why he was at the facility and how the evaluation and treatment process was going to work.  TR 17.  In his own words, the Defendant was able to explain back to Dr. Cochran what he had heard.  TR 18.  He was also able to report that his date of birth as listed in the Bureau of Prison's records was incorrect.  EX 2, P.1, Fn. 1.  Dr. Cochrane described the Defendant as very polite, calm and not in any kind of distress; he knew who he was but was not sure where he was, what time it was or what the current date was; he made good eye contact and related well to Dr, Cochran; his speech was a bit halting and raspy but Dr. Cochran understood him clearly; his thoughts seemed to be organized and goal directed.  TR 17-21.  He was not, however able to relay basic things like whether he was married or had any children or how he did in school. TR 25.  He reported that he had

been incarcerated for 30 years but wasn't able to say what crime he committed.  TR 25. He went on to say that when he was released from custody and put on probation, he was appointed a guardian by the name of Julie Martin.  TR 25.  Dr. Cochrane later determined that the Defendant did not have a legal guardian.  TR 68.  Dr. Cochrane believes that by referring to a guardian, the Defendant was trying to appear disabled and in need of help. TR 75.  He didn't realize that Dr. Cochrane might actually follow up and determine who the person was.  TR 75.

Defendant shared with Dr. Cochrane that his memory was declining yet he had no trouble following what the doctor asked; nor did he ask Dr. Cochran to repeat anything. TR 21-22.  Given his age and self-reported memory problems, Dr. Cochrane felt it prudent to conduct some neuroimaging.   TR 24.   The MRI brain scan showed no acute abnormalities; there was no obvious evidence of volume loss or tissue depth, no infarct or evidence of a stroke.  TR 24.  There were some hyperintensities that were noted in the white matter but that is not uncommon for people in their eighth decade of life.  TR 24. Dr. Cochran explained that while an MRI could not detect Alzheimer's or dementia, as it is not a diagnostic tool, it could identify tumors or hemorrhages that would be consistent with those diseases.  TR 60, 95.

Dr. Cochrane explained that the onset of Alzheimer's presents itself when a person is in their seventies and eighties and noted that the Defendant fell within that period.  TR 62.  Dr. Cochrane also stated that Alzheimer's has a genetic correlation and does run in families and that a person whose father or grandfather had Alzheimer's (as was reported by the Defendant) is at a higher risk of developing the disease.  TR 61.

Dr. Cochrane described some of the Defendant's physical ailments and how those might affect cognitive functioning.  TR 62-64.  The Defendant reported a pulmonary embolism, congestive heart failure and atrial fibrillation.  TR 62-64.  Dr. Cochrane admitted that those ailments could potentially lead to neurocognitive decline.  TR 62-64.  Dr. Cochrane also noted that the Defendant had a head injury while at the Department of Corrections and if severe enough could potentially lead to neurocognitive decline. TR 66.

Because of the Defendant's reported memory problems, he was first placed in the transition unit where there were more officers present and he could be better observed by nurses.  TR 27.  All staff members indicated that he was doing quite well, so he remained there for only a week and was then placed in the open unit.  TR 27-28.  The open housing unit is an area where patients have the most access to things such as recreational activities and the library; it's a place where they can interact with a greater number of people.  TR 28-29.  Although the Defendant reported getting lost a couple of times in the large facility, he had no trouble getting to the dining hall and back or to his appointments.  TR 29-30.  There were never any reports from staff that he wandered, got confused or needed extra help.  TR 30.

During his second meeting with the Defendant on November 26, Dr. Cochrane reports that the Defendant's presentation wasn't much different.  TR 30.  He was pleasant and made good eye contact and the two had back and forth conversation with relative ease.  TR 30. Staff provided similar information.  TR 31.  He always acted appropriately, followed instructions, and never needed help with anything.  TR 31.  Defendant's only complaint was that he had trouble with memory and confusion.  TR 31.  The staff at Butner

informed Dr. Cochrane that they had no concerns about the Defendant's behavior in the open unit. TR 48.  He was always the first in the pill line for his medication and would often read a book while he was waiting in line.  EX 2, p. 5; TR 48.

Dr. Cochrane next met with the Defendant in December.  TR1 31.  His presentation was similar and he again stressed his memory problems.  TR 33.  During this interview as in the others, the Defendant did not ask the doctor to repeat anything.  TR 33.  He understood the questions and his answers were always on point.  TR 33.  The dialogue was routine and unremarkable. TR 33.  The Defendant's behavior contrasted with his complaint that he was struggling with his memory.  TR 33.

At this meeting, the Defendant agreed to participate in testing and that's when Dr. Cochrane tried to administer the Montreal Cognitive Assessment.  TR 32.  That test is a screening measure to assess cognitive abilities such as orientation, attention and memory. TR 101.  It's often given as a preliminary instrument to see if a person has deficits that warrant further inquiry. TR 101.  After completing the first item, the Defendant gave up, saying he could not complete it. TR 32.  He said his memory was getting worse and again talked about his family members having Alzheimer's.  TR 32.  He again spoke about his Florida guardian of two years.  TR 32.  Dr. Cochrane remembers that the Defendant mentioned that one of his medications for neuropathy had not been renewed.  TR 32.  Dr. Cochrane later learned that the Defendant had correctly remembered which medicine that was.  TR 32.

Dr. Cochrane and one of his colleagues also attempted to administer two other tests, the Shipley-2 (an intellectual screening instrument) and the Validity Indicator Profile (a

test to determine degree of effort).  TR 39-41, 104.    Those tests are done in a small group setting with four or five other defendants.  TR 39.  The Defendant got to the testing room and sat where he was told but needed a lot of repetition with the instructions.  TR 40.  He insisted that he could not do the testing because he was confused.  TR 40.   At some point during his stay, the Defendant was referred to a Competence Restoration Group, a weekly class where instructors teach defendants about the legal system.  TR 35.  The defendant would not participate.  TR 36.  Dr. Cochran was not terribly concerned that he would not attend as he believed that the Defendant had a decent factual grasp of things.  TR 38.  Dr. Cochran admitted that he did not attempt a TOMMs, which is a test of memory malingering that typically takes 45 minutes to an hour to administer.  TR 104-105.  After the first three failed attempts at testing, Dr. Cochrane saw no point in trying to administer additional tests.  TR 105.

The last clinical interview Dr. Cochrane had with the Defendant was on February 21, 2019.  TR 48, EX 2.  The Defendant stressed how much trouble he was having comprehending other people but told Dr. Cochrane that he understood him without any difficulty. TR 48-49. Dr. Cochrane brought up the fact that he would like to try to administer the Montreal test again, but the Defendant said he did not believe he could do it.  TR 49.  Because Dr. Cochrane could not conduct any formal standardized measures, he tested or probed the Defendant about his knowledge of certain information that people with cognitive problems still retain.  TR 49.  Dr. Cochrane referred to studies that demonstrate that even people with advanced brain injuries, Alzheimer's and psychotic illnesses are immune to forgetting what is called "overlearned information."  TR 49.  So Dr. Cochrane

asked the Defendant if he could recall and recite the alphabet; he said he could not.  TR 50. According to Dr. Cochrane, when people embellish deficits, they claim not to know answers to overlearned information.  TR 49.  Looking at the Defendant's behavior on the unit and how he interacted casually and during interviews with him, not being able to answer a simple question on a test was not consistent with the things the Defendant was clearly able to do, like take care of himself and make sure his needs were met.  TR 72.

Dr. Cochrane's assessment that the Defendant had antisocial personality disorder was based largely on the Defendant's criminal history.  TR 97.  But his behavior also suggested that he led a lifestyle that included deception.  TR 100.   For example, he used multiple aliases throughout his life.  TR 100.  Dr. Cochrane further explained that a person's personality, even if it's adaptive or maladaptive and disordered, isn't typically considered a mental illness or mental disorder, but rather, just an aspect of a person's character.  TR 97.  While a personality disorder is not relevant to whether a person is competent to stand trial, it can be noteworthy because sometimes personality disorders can mask or appear as if they're mental disorders.  TR 97-98.  As it relates to malingering, Dr. Cochran explained that if a person has a history of fraudulent activities or has been dishonest in other ways, it certainly factors into the equation when one is considering a diagnosis of malingering.  TR 100-101.

Dr. Cochrane was asked to differentiate between malingering and factitious disorder.  TR 110.  The main difference he explained is the gain or motivation.  TR 110. In malingering, a person is grossly exaggerating symptoms for some secondary gain, such as getting out of military service, or avoiding criminal prosecution or obtaining money

through disability or a lawsuit.  TR 111.  In factitious disorder, the person is embellishing symptoms to get sympathy and attention, so the motivation is more of an emotional need.  TR 111.  Dr. Cochran did not believe the Defendant had factitious disorder as he didn't seem to be embellishing symptoms so that doctors would lavish him with attention or run a lot of tests on him.  TR 111.

Given the setting Dr. Cochrane works in, he assumed that the Defendant was malingering to avoid criminal prosecution.  TR 120.  He believed that, like a lot of people at the facility, the Defendant thought that his case would be dismissed if he was found to be incompetent.  TR 123. Dr. Cochrane added that he did not know for certain what was going through the Defendant's mind or what his motivations were.  *Id.*  By ruling out other apparent motivations, he safely concluded that the Defendant's motivation for malingering was to avoid prosecution.  TR 124.  When asked if avoiding prosecution was a necessary conclusion to draw before diagnosing malingering, Dr. Cochrane said it was one of the criteria; otherwise it would be called exaggeration, but it would still be falsely representing oneself.  TR 124.

Dr. Cochrane was asked what the normal decline of a person would be who did not have a traumatic brain injury and was not abusing substances.  TR 113.  He explained that in the sixth and seventh decade of life you start seeing forgetfulness and mild memory decline, but it doesn't interfere with daily functioning.  TR 113.  Sometimes the person will need and benefit from compensatory strategies, like using a pill box or writing notes so they don't forget things at the grocery store.  TR 113.  You would not, however, expect to see significant cognitive decline to the point of being demented.  TR 113-114.

Based on the following factors, Dr. Cochrane concluded that the Defendant was malingering:  his background suggested that he had an antisocial personality disorder; his MRI brain scan confirmed that he had no significant cranial injuries, no hydrocephalus, no infarct and no stroke; the taped statement he provided the FBI after the arrest (as relayed by Dr. Johnson) contained a very detailed account of the alleged robbery; he wasn't consistent with things he did recall when it was convenient for him; and he couldn't do what people even with advanced problems can do, like recite the alphabet.  TR 51-53. Because the Defendant did not suffer a stroke or a traumatic brain injury or any other significant event since Dr. Johnson had evaluated him, it defied logic that he would now have all of these problems with no clear intervening event.  TR 53.

Dr. Cochrane concluded with a reasonable degree of psychological or scientific certainty that the Defendant was competent.  TR 114.  He understands the nature and consequences of the proceedings against him.  TR 115.  He can assist properly in his defense.  TR 115.

### B.     Defendant

After responding to defense counsel that he is 82 years old, the Defendant read from a prepared hand-written statement.  The Court notes that the Defendant read from what appeared to be a lengthy statement written on a legal pad.  He spoke slowly and in a raspy voice but enunciated clearly.  He held the statement out in front of him as he read.  At no time did his hands shake or did it appear that he was having trouble reading his handwriting.

According to the Defendant, he suffers from aphasia, a deterioration of the ability to hear, speak, read and write.  TR 152, 175.  As he's gotten older, his memory has gotten

worse; he doesn't remember addresses or telephone numbers and doesn't recognize some of his children.  TR 176-177.

With respect to his hearing, the Defendant stated that when he had the headset on in court, he was able to hear.   TR 178.  He was also able to write the note he read to the Court.  TR 178-179.  No one helped him write it.  TR 179.  He wrote it over a period of time but had some difficulty deciphering it because his hands were shaking which made his handwriting bad. TR 179.

The Defendant stated that he has been diagnosed with Alzheimer's disease as have members of his family-- his father, his father's twin brother and his paternal grandfather.  TR 152, 174.  He also shared that he suffered from head trauma on several occasions.  TR 175.   He was able to provide the exact date when he hit his head on concrete and recalls an attack in 1995 at the Florida Department of Corrections when he was hit with a padlock in a sock as he exited the showers.  TR 175, 180.

The Defendant was asked on cross-examination about  his  interview  with  Drs.  Johnson and Menchola.  TR 170.  He claimed to have no memory of those events and only remembered events at Butner because he had taken notes.  TR 170, 183.   He refuted Dr. Cochrane's testimony saying that he did not meet with the doctor for an hour seven or eight times; he met with him four or five times, and only for 15 minutes.  TR 153.  He claims the interviews were rushed and superficial, consisting mainly of small talk, never anything meaningful.  TR 153.  Dr. Cochrane conducted one scheduled written test that would have been simple for a college educated man like himself, but his hands were shaking so badly that he could not write his name or check off the multiple-choice boxes.  TR 154.

The Defendant testified extensively about the "blatant untruths propagated by Dr. Cochrane."   TR 155:24. He complained of racial bias stating that the staff was predominantly black and heavily biased against white detainees.  TR 156.  He stated that there was considerable homosexuality at the hospital as well as violence.  TR 156.

The Defendant referred to the video-taped confession and stated that the perpetrator is not the real Robert Krebs.  TR 158.  He did, however, want to withdraw his not guilty plea and plead guilty likely because he did not favor the environment at Butner.  TR 158, 194.   On cross-examination and on re-direct, the Defendant insisted that he did not remember giving the statement to the FBI.  TR 163, 182.  It was the other Robert Krebs, the one who took over his identity.  TR 163-164.  He also claimed not to remember any of the details of his arrest but because he took copious notes, he did remember extensively what occurred at Butner FMC.  TR 165.

## IV.    Conclusions

Criminal defendants have a constitutional right to be competent during trial. *Indiana v. Edwards*, 554 U.S. 164, 170 (2008). The standard for mental competency is whether an individual has a "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402, (1960); *Torres v. Prunty*, 223 F.3d 1103, 1106 (9th Cir. 2000); 18 U.S.C. § 4241(d). "Whether a defendant is capable of understanding the proceedings and assisting counsel is dependent upon evidence of the defendant's irrational behavior, his demeanor in court, and any prior medical opinions on his competence." *United States v. Gastelum–Almeida*, 298

- 20 -

F.3d 1167, 1171 (9th Cir. 2002) (quoting *Miles v. Stainer*, 108 F.3d 1109, 1112 (9th Cir. 1997)). The government has the burden of demonstrating that the defendant is competent to stand trial by a preponderance of the evidence. *United States v. Hoskie*, 950 F.2d 1388, 1392 (9th Cir. 1991).

A court's determination of competency is a factual, rather than a legal determination. *United States v. Mackovich*, 209 F.3d 1227, 1232 (10th Cir. 2000). In determining competency, a court "may rely on a number of factors, including medical opinion and the court's observation of the defendant." *United States v. Boigegrain*, 155 F.3d 1181, 1189 (10th Cir. 1998). Where, as here, multiple experts have offered opinions, the district court may find a defendant competent by adopting the findings of one expert and discounting the contrary findings of another. *Miles v. Dorsey*, 61 F.3d 1459, 1472-74 (10th Cir. 1995).

### A.    Nature and Consequences of the Proceedings

The preponderance of the evidence shows that Defendant understands the nature and consequences of the proceedings against him. When initially interviewed by the FBI just days after his arrest, Defendant was able to meticulously explain how he planned and carried out the robbery. He explained that he was struggling to adjust to the life outside prison and claimed that he did not wear a disguise or mask during the robbery because he wanted to get caught. Similarly, when interviewed by Dr. Menchola, Defendant stated that he knew that he was charged with bank robbery and that it was a felony. He knew that a felony was more serious than a misdemeanor. He reportedly knew his plea options and understood the roles of the judge, jury and attorneys.

Although Defendant was largely uncooperative, Dr. Johnson also concluded that the Defendant understood the nature and consequences of the proceedings. In reaching his conclusion, Dr. Johnson noted that Defendant described the role of a defense attorney, a prosecutor and judge to Dr. Menchola. Dr. Johnson also noted that during the interview with the police, Defendant demonstrated an understanding of his legal right to remain silent, and the right to an attorney. He further noted that Defendant understood that that he could face punishment if found guilty of the charges and could go to prison. Based on these considerations, Dr. Johnson concluded that Defendant "has a rational and factual understanding of the workings of the court and the roles of the key individuals in a court proceeding." EX 6, 6.

Like Dr. Johnson, Dr. Cochrane was able to form an opinion regarding Defendant's ability to understand the nature and consequences of the proceedings based largely on the FBI interview. Dr. Cochrane stated that during that interview, Defendant "communicated clearly and appeared to understand his legal situation." Thus, even though Dr. Menchola ultimately opined the Defendant was not competent for other reasons, all of the experts agree that he understands the nature and consequences of the proceedings.

**B.    Ability to Assist Counsel**

Under *Dusky*, whether a defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" is evaluated based on the defendant's ability to effectively participate in his defense by communicating effectively with his lawyer. *See Drope v. Missouri*, 420 U.S. 162, 171-72 (1975). Here, the Court adopts Dr. Cochrane's opinion and concludes that the Defendant can assist counsel.

Dr. Cochrane concluded that by a reasonable degree of psychological or scientific certainty that the Defendant is competent. That opinion, as expressed in his report and testimony at the hearing, is based on months of observation, clinical interviews, and review of records. Of the three experts involved in this case, Dr. Cochrane had a much greater ability to observe Defendant in a variety of settings and had the advantage of the availability of the previous opinions provided by Drs. Menchola and Johnson. The latter two doctors' opinions were based on one-day evaluations while Dr. Cochrane's opinions were based on much more extensive interaction with Defendant over the period of several months. Dr. Cochrane reported that he had six to eight sit-down, full-length interviews with Defendant and saw him several other times in passing.

Dr. Cochrane concluded that the Defendant did not suffer from a mental illness or cognitive impairment. Rather, Dr. Cochrane diagnosed the Defendant with antisocial personality disorder and malingering. The evidence cited in support of these conclusions is compelling. Although the Defendant consistently complained of memory troubles and confusion, while at Butner FMC he followed instructions, never needed help, and could find his way around the facility. MRI imaging revealed no acute abnormalities for a person in their 80s. Dr. Cochrane also noted that the Defendant had done well in the open housing unit at Butner and that the staff had no concerns with his behavior.

The Defendant's presentation caused both Dr. Johnson and Dr. Cochrane to believe he was exaggerating his symptoms or malingering. Evidence from all three experts shows that the nature of Defendant's symptoms shifted radically from one clinical encounter to another. He was initially cooperative with Dr. Menchola before becoming less cooperative

as the assessment progressed. He was entirely uncooperative with Dr. Johnson. And while at Butner was intermittently cooperative with Dr. Cochrane. As Dr. Johnson explained, dementia would not present in this manner. Rather than coming and going symptomology, it would come on gradually and in a downward, step-like fashion. Dr. Cochrane additionally noted that those suffering from Alzheimer's disease are immune to forgetting "overlearned information" such as the alphabet and when the Defendant was asked to recite the alphabet, he said he could not do so. Taken together, these findings indicate that the Defendant is not suffering from Alzheimer's or dementia.

The conclusion that the Defendant is not suffering from dementia or Alzheimer's disease is also supported by his own testimony. The Defendant claimed that he had memory deficits and had difficulty writing, reading and speaking. However, during the hearing, he read from a lengthy and articulate hand-written statement. His memory of events was also selective. He claimed that he could not recall giving a statement to the FBI, but he remembered dates he was previously injured and went to the hospital and had excellent recollection of his time at Butner. These considerations support Dr. Johnson and Dr. Cochrane's finding of malingering.

However, the defense contends that Dr. Cochrane's determination that the Defendant is malingering is undermined by his finding that the malingering was motivated by the Defendant's desire to avoid criminal prosecution. In support of this contention, the defense points out that the Defendant told the FBI agents that he committed the robbery so that he could return to jail. If returning to jail was Defendant's goal, the defense contends, there is no reason for him to exaggerate his symptoms. While the defense's argument merits

attention, it ignores some significant considerations. While it is impossible to know what the Defendant was thinking, he very well may have believed that feigning mental illness would have allowed him to be housed in conditions that were preferable to prison. It may very well be that his experience at Butner dissuaded him of that belief as evidenced by his stated desire at the hearing to withdraw his not guilty plea, plead guilty and, presumably, serve a lengthy prison system. Alternatively, the Defendant's malingering could be explained by Dr. Cochrane's diagnosis of antisocial personality disorder. That disorder is characterized by deceit and manipulation— the precise behavior Dr. Cochrane believes the Defendant is engaging in by malingering. While the Defendant's motivations cannot be conclusively determined, the Court nevertheless finds that the weight of the evidence before the court is consistent with malingering.

Dr. Cochrane's ultimate opinion on whether Defendant can effectively work with his attorney noted that Defendant could listen and respond clearly and relevantly to questions, could attend to courtroom procedures and, if necessary, testify. The Court finds that Dr. Cochrane's opinion aligns with Dr. Johnson's opinion and with the Court's own observations. Even if the Defendant is suffering from some form of mild dementia or Alzheimer's disease, it is not severe enough to render him incompetent. Thus, the Court finds that the Government has proven by a preponderance of the evidence that the Defendant is competent.

## V.     Recommendation

The Magistrate Judge recommends that the District Court adopt this recommendation and find that the Defendant is competent to stand trial.     This

Recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals.  Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the District Court's judgment.  However, the parties shall have fourteen (14) days from the date of service of a copy of this recommendation within which to file specific written objections with the District Court.  See 28 U.S.C. § 636(b)(1) and Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure. Thereafter, the parties have fourteen (14) days within which to file a response to the objections. No replies are permitted without leave of court.  If any objections are filed, this action should be designated case number: CR 18-263-TUC-JGZ.  Failure to timely file objections to any factual or legal determination of the Magistrate Judge may be considered a waiver of a party's right to de novo consideration of the issues.  *See United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc).

Dated this 19th day of June, 2019.


Honorable Jacqueline M. Rateau
United States Magistrate Judge