MICHAEL BAILEY
United States Attorney
District of Arizona
RAQUEL ARELLANO
Assistant United States Attorney
AZ State Bar No.: 011796
CHRISTINE A. MELTON
Assistant United States Attorney
AZ State Bar No.: 021649
United States Courthouse
405 W. Congress, Suite 4800
Tucson, Arizona 85701
raquel.arellano@usdoj.gov
christine.melton@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States America,<br><br>    Plaintiff,<br><br>vs.<br><br>Robert Francis Krebs,<br><br>    Defendant. | CR 18-00263-TUC-JGZ (JR)<br><br>**TRIAL BRIEF** |

The United States of America, by and through its counsel, undersigned, and Raquel Arellano and Christine Melton, Assistant U.S. Attorneys, files its trial memorandum.

**I. CHARGE AGAINST THE DEFENDANT**

The defendant, Robert Francis Krebs, is charged via an indictment with armed bank robbery in violation of 18 U.S.C. §§ 2113(a) and (d). (ECF Doc. 8.) The charge derives from the armed robbery of the Pyramid Federal Credit Union on January 12, 2018. The matter is currently set for trial on March 2, 2020.

**II. STIPULATIONS**

The parties have discussed the following proposed stipulations, which the government anticipates will be filed with the Court. The defense has not formally accepted the stipulations as of the filing of this brief. The proposed stipulations would establish the following:

1. The deposits of Pyramid Federal Credit Union have been insured by the National Credit Union Administration Board since May 12, 1978, and were insured by the National Credit Union Administration Board on the date of the robbery in this case, January 12, 2018.

2. The Government's Exhibits 1 and 2 are copies of the Pyramid Federal Credit Union's certificate from the National Credit Union Administration (NCUA), and are admissible at trial.

3. The video surveillance clip of the McDonald's depicts a man sitting at an outside table for about 15 seconds and then gets up to leave, heading toward the direction of Oracle Rd.

4. The fingerprint lab report of the comparison made of the known fingerprints of Robert Francis Krebs, obtained in November, 2019, and which were compared to latent fingerprints obtained at the bank on January 12, 2018.

5. Stipulated verdict forms (ECF Doc. 124.)

**III. STATEMENT OF FACTS**

On January 12, 2018, at approximately 3:20 p.m., the defendant entered the Pyramid Federal Credit Union wearing no disguise and carrying a shoulder strap black bag which contained a smaller black bag within. A black handgun was inside the larger bag. The black handgun was later determined to be a BB gun. The defendant approached Bank Teller A. M.'s counter, removed the smaller black bag from the large bag and placed the smaller bag on the counter. He then retrieved a black handgun from the larger bag and placed the gun on top of the bag laying on the counter. He demanded that A. M. give him all her money. The gun was pointed in the direction of A. M. He insisted that she give him money that was in the bottom drawer, as well, and questioned if that was all the money. She put the money inside the smaller black bag. He placed his hand on the gun as if gripping it. She passed bait bills. She also handed him stacks of paper-clipped $5 bills. He threatened to shoot her if she pressed the alarm button. He grew agitated when he pointed toward a $20 bill and rolls of coin that she gave him. She was scared and terrified.

She freaked out. He pointed toward checks she had. She did not know what he was going to do with the gun as it appeared that he was fidgeting with it as he grew agitated.

The teller adjacent to A. M., Bank Teller K. A., overheard the discussion about $20 bill and turned to see A. M. placing money in the black bag. At that point, K. A. realized they were being robbed. She pressed the alarm button. The defendant stepped over to K. A. and demanded money from her. He pointed the gun at her. He asked her if she had pressed the alarm button, all the while still staring at A. M. After K. A. denied having pressed the button and began to put money in the bag. He insisted on money from the bottom drawer. He seemed nervous and agitated and threatened to use "this" saying he was not afraid to use it and that he had "done this before". He was implying use of the gun. He insisted that they just give him time to leave. He threatened that they better not press the alarm or he will come back inside and shoot them if he saw cops. Both of the tellers described the man as elderly, balding, thin build, wearing glasses, a black should bag, tweed blazer jacket, and walking slowly.

After receiving approximately $8,384.84 in cash from the two bank tellers, the defendant walked out of the Pyramid Federal Credit Union and walked eastbound. He headed toward the direction of the Tucson Mall across Oracle Road. A surveillance video obtained from the McDonald's which is adjacent to the bank depicts an elderly man matching the description of the robber stopping to sit at an outside table of the McDonald's. The man is seen sitting for about 15 seconds and then getting up to walk eastbound toward the direction of Oracle Rd. and the Tucson Mall.

A bank employee, C. V., had been inside the break room of the bank during the robbery. He heard the flickering of the silent alarm, looked up and saw an elderly man standing at K. A.'s counter. He was wearing a blazer. C. V. saw K. A. placing money inside a bag on the counter. C. V. called 911 and then stepped out the back door of the bank to see if he could spot the robber in the area. C. V. saw an elderly man walking in the parking lot just north of the McDonald's heading toward Oracle Rd. and toward the Tucson Mall. C. V. was still on the phone with the 911 operate as he saw the man walking.

C. V. told the operator it appeared that the man was heading toward the J.C. Penney's. He was still on the line when he lost visual of the man.

The defendant walked across Oracle Road and to the Tucson Mall. The defendant went to the Sears department store and went to a vestibule where he had previously stashed a wheelchair shortly before the bank robbery. Video surveillance obtained from the Sears store depicts an elderly man wearing a tweed jacket, balding, pushing a wheelchair into the Sears store. He is seen leaving a wheelchair in a vestibule area of the store (west entrance of the store near the automotive department) and then exiting the store. The time on the video shows it to be about 3:20 p.m., shortly before the robbery. Video surveillance shows the man returning to the Sears store at approximately 4:05 p.m., matching the same description and wearing a black shoulder bag. He is seen retrieving the wheelchair from the vestibule area. He is seen the wheelchair into the Sear's men's restroom whereupon he remains for approximately 8 minutes. The video shows the man emerge from the restroom, but this time he is wearing different clothing. He had removed and discarded his outer layer of clothing. He is seen milling around the Sears store. The video shows him at a cashier register purchasing an item. The video depicts him on the second level of the Sears store, pushing the wheelchair and wearing a grey sweater. Video surveillance of the Tucson Mall depicts the man's activities throughout the mall. At times he is seen pushing a wheelchair and at other times sitting in the wheelchair and propelling himself. Video surveillance shows the defendant milling around in the mall until approximately 9:00 p.m. when he is seen outside the mall area. It is dark outside.

Tucson Police Department officers obtained still photos of the bank surveillance depicting an elderly man entering the credit union and standing at the teller counter. The photos were circulated as media release announcements of the robbery.

The following day, a Tucson Police Department officer was summoned to the Hampton Inn, located on Oracle Rd, north of the Tucson Mall. There, an officer spoke with the manager of the Hampton Inn. He also spoke with an employee, M. S., who informed him that she had seen a media release photo of the bank robber after she left work

at the Hampton the night before. She had gone home and had logged onto her Facebook account the following morning when she saw the media release announcement. She saw the photos of the bank robbery and immediately recognized the robber as the man who had gone to the Hampton Inn on the night of the robbery. She called 911 after seeing the media release. She said that the man was elderly and appeared to be using a walker. He had requested a stay at the Hampton Inn and was willing to pay cash for the room. She declined his request because cash is not accepted at the Hampton Inn, but referred him to the Best Western hotel just further north on Oracle Rd. The man was told that the Best Western hotel accepts cash. The man was wearing a hat, glasses, and was elderly. He tried to pay with a paper-clipped stack of $5 bills. She saw that he appeared to be retrieving another stack of paper-clipped $5 bills. The Hampton Inn manager found video surveillance footage from the night before and showed the officer. The officer saw the video and saw a thin elderly man at the counter. The man was wearing a black hat/cap, grey sweater, and glasses. The officer obtained still photographs from the video surveillance and showed the photographs to M. S., who identified the man as the person who tried to rent a room the night before. The photos depict a thin elderly man wearing a black hat/cap, grey sweater and glasses.

The Tucson Police officer went to the Best Western hotel, but was directed to the Flamingo Suites hotel, across the way, which accepts cash. At the Flamingo Suites hotel, the officer met with the manager, S. L., who identified the man in the media release photos as a resident of the hotel: Robert Krebs. She said Robert Krebs had been staying there for about a week. She said that the defendant was staying in Room 114 of the hotel. Officers also learned that the manager had authorized the hotel's maintenance housekeeper to accept $305 in cash that morning at about 7:30 a.m. The money, which was all in $5 bills, was applied toward Robert Kreb's room and she prepared paperwork extending his stay for another week. The manager had change to give to Robert Krebs upon his return and had a new hotel receipt for him to sign. She also had re-programmed his room key for another week's stay and had that ready for him. She later provided a copy of the hotel receipt dated

- 5 -

January 6, 2018, from when Robert Krebs checked into the hotel. She also provided a copy of a Florida identification card that Robert Krebs had shown to her when he checked in. She also provided an actual business card that Robert Krebs gave to her around January 1, 2018, when he first arrived at the hotel inquiring about room availability. He was shown a room then and liked the hotel. He stated that he would return to rent a room. He provided his business card that said: "Robert Krebs, Paralegal Extraordinaire" and which contained a cell phone number. He told her then that he worked for a criminal attorney. She told the officer that Robert Krebs had returned on January 6, 2018, and checked into the hotel.

Tucson Police Department officers established surveillance of the hotel awaiting the arrival of the defendant. Later that evening, the defendant was observed walking toward his hotel room while pushing a wheelchair. He was walking toward the direction of the office when officers detained and arrested him. Hanging from the wheelchair was a black shoulder bag that contained a brown leather bag. The brown leather bag contained a black BB gun, a brown bag that contained a large quantity of currency, approximately $6,224.00, $1,000 worth of pre-paid VISA cards paid in cash, and a green spiral notebook. The green spiral notebook contained handwritten notations such as a listing of three different banks and a Walmart shopping list that included the word "gun". These items were taken into evidence. Other items were found in the defendant's possession. A Safeway receipt dated January 13, 2018, which depicts the purchase of two Pre-Paid Visa cards totaling each $500 and which were paid in $1,000 in cash. A Sun Tran card depicting a photograph of the defendant with the name Robert Francis Krebs was also found. The photo shown in the Sun Tran card shows a man with white/silver colored hair, which is different than the hair color in the Florida ID card and is different from the hair color on the date of the robbery and the next day. A receipt was found dated January 5, 2018, from a beauty school showing $30 paid for "hair color". Finally, a Florida identification card issued in July, 2017, depicting the name Robert Francis Krebs and showing a photograph of a man was found in the defendant's wallet.

Tucson Police Department officers searched the defendant's hotel room and found

a number of personal items. Specifically, the following items were found: a smaller black bag, clothing that resembled the clothing worn during the robbery such as a tweed blazer, maroon long sleeved shirt, and a black cap.

**January 13, 2018 Statement of the defendant – Post-*Miranda***

On day of his arrest, January 13, 2018, following a waiver of his *Miranda* rights, the defendant was interviewed by a state robbery detective and an FBI agent. During the audiotaped interview, the defendant claimed he did not know anything about the BB gun found in his possession. He also stated that he was not in the same part of town as the robbery. He claimed he was downtown and had even greeted a police officer on a bicycle. He did not make any admissions regarding the robbery. In his statement, the defendant told the officers that he is "happier in prison". The defendant mentioned medical issues he had and claimed that the last few months had been especially hard on him. Toward the end of the interview, a discussion arose regarding the case going federal versus state. He told the officers that he would tell them all they wanted to know, if the case went federal, but he knew that was not an easy thing to arrange. The officers made no promises, but said they would pursue it. Much of the defendant's statement is self-serving.

Following the interview, the defendant's the clothing and prescription glasses were taken from him as evidence. He was wearing a grey sweater, black Adidas training pants with white stripes down the side, and a large pair of brown prescription glasses. The glasses appear to be the glasses worn during the robbery. The clothing appear to be the clothing the defendant wore at the Tucson Mall and later seen in a video at the Hampton Inn.

**January 23, 2018 Statement of the defendant – Post-*Miranda***

The defendant was later interviewed by FBI agents on January 23, 2018. The interview was videotaped and is approximately 45 minutes long. Following a waiver of his *Miranda* rights, the defendant admitted that the person depicted in the bank and mall videos was him. He stated that he robbed the credit union because he needed money. He gave specific details about his pre-planning to commit the robbery. He stated that he purchased a BB gun days before the robbery, had visited the credit union once before, and

had visited other banks, as well.  He stated that he visited the J.C. Penney's and Sears at the Tucson Mall beforehand and had gone to the men's bathrooms to see the egress of those locations.  He stated that he chose to use a BB gun in order to intimidate the tellers.  He said he chose the credit union because it was an "easy robbery" in that there was no glass (presumably meaning to separate the customers from the tellers), the tellers were young girls, and the location of the bank was close to a shopping mall.

He described his activities before and after the robbery.  He said he had gone into the Sears store on that day and had and left his wheelchair in an area near the Optical Dept. and then after the robbery, went back to retrieve his wheelchair.  He stated he then went to the men's bathroom to remove his outer clothing, discarded items, and went about the Sears store to purchase items and get rid of the $1 bills he got.  He said that underneath his pants, he had on a pair of black Adidas training pants.  He said that he removed his maroon shirt.  Videotape surveillance from the Sears and the Tucson Mall depict his activities and corroborate much of what he said he did.

He made other statements such as that he is very organized, that it is his very nature to be organized, and that he is always well organized.  He stated that he purchased the BB gun because the diameter of the barrel's opening was small enough and he felt that the gun looked like the real thing.  He stated that he didn't think that someone who was not familiar with guns would be able to tell the difference between a fake and a real gun.  He said that the young teller was scared, but that the older one was not.  He was surprised when told that the tellers were afraid and said that he was polite to them.  He said that so long as they did not have to come to court, they would be alright.  He also added that he would not want any of his female family members to work in a bank because it is dangerous working in a bank. The defendant was fingerprinted and a photograph of him was taken.

On January 17, 2018, the two bank tellers were shown photos of six men (including the defendant's) and all matched the description of the defendant.  The photos were show to the tellers and both positively identified the defendant's photo as the robber.

1  **IV. ELEMENTS OF THE OFFENSE**

As noted above, the defendant is charged via indictment with one court of Armed Bank Robbery in violation of 18 U.S.C. §§ 2113(a) and (d). The elements of the offense are:

**Armed Bank Robbery (Count One)**

First, on or about January 12, 2018, the defendant, through force and violence, or intimidation, took money belonging to or in the care, custody, control, management or possession of Pyramid Federal Credit Union, located at 4491 N. Oracle, Tucson, Arizona 85712;

Second, the deposits of Pyramid Federal Credit Union were then insured by the National Credit Union Administration Board; and

Third, the defendant intentionally made a display of force that reasonably caused A. M. and K S. A. to fear bodily harm by using a black handgun/BB gun.

A weapon or device is dangerous if it is something that creates a greater apprehension in the victim and increases the likelihood that police or bystanders would react using deadly force.

**V.     EVIDENTIARY ISSUES**

**A. Fed. R Evid. 609 (ECF Doc. 83.)**

The government filed notice of its intent to impeach the defendant with his prior felony convictions. (ECF Doc. 83.) Specifically, the prior felony convictions are: Theft of Property Valued More than $1000 in CR 3836, dated September, 1988, Pima County, AZ; Armed Robbery in CR 06379, dated September 21, 1988, Pima County, AZ; and Burglary of a Structure and Robbery with a Gun in E81-1086-CFA, dated April, 1989, Seminole County, Florida. No opposition motion was filed. The government has certified prison packets from Arizona and Florida that contain conviction documents, photographs, fingerprints, and personal biographical information of the defendant.

/ / /

**B. Government's Notice of Intent to Rely on Expert Witness Testimony (ECF Doc. 110)**

On January 23, 2020, the government filed a notice of intent to rely on expert witness testimony. No opposition motion was filed. The notice stated that the government may call a fingerprint expert with regard to fingerprints taken of the defendant. The name of the curriculum vitae of the expert would be disclosed in advance of trial. The notice also indicated that the government may call Dr. Bennett Blum, M.D., to testify as to his findings and opinion related to the defendant's Notice of Insanity. The government provided notice that Dr. Blum is a certified psychiatrist who was appointed by the Court to evaluate the defendant's case and provide an opinion as to the defendant's sanity at the time of the crime in this case. Dr. Blum's testimony may include any and all opinions proffered in his report, as well as the basis for those opinions, which would be disclosed in advance of trial, along with his curriculum vitae. His curriculum vitae has been disclosed to the defense.

**C. Government's Supplemental Notice of Intent to Rely on Expert Witness Testimony (ECF Doc. 123)**

On February 5, 2020, the government filed a supplemental notice of intent to rely on expert witness testimony. No opposition motion was filed. The government provided supplemental notice of the fingerprint expert who may be called by the government. The government indicated that it may call Meredith Aitchison, a Certified Latent Print Examiner with the Tucson Police Department Crime Laboratory. She performed a comparison of the defendant's known fingerprints to latent prints lifted from the crime scene and prepared a report of her findings. The report has been disclosed to defense counsel. Her curriculum vitae has been disclosed to the defense. The defendant stipulated to the expert witness' report, as noted above.

**D. Government's Motion Filed Under Seal (ECF Doc. 114)**

On January 27, 2020, the government filed a motion under seal (ECF Doc. 114). An opposition motion was filed. The Court heard argument on the motion on February 13,

2020, and the Court granted leave for the defense attorney to file a proffer by noon on January 24, 2020, of what the defendant's proposed testimony would be. The Court took the matter under advisement.

**E. Government's Motions *In Limine* Filed Under Seal (ECF Doc. 111)**

On January 27, 2020, the government filed motions under seal. Opposition motions were filed. The motions are set for argument on February 24, 2020.

**F.  Government's Motion *In Limine* to Admit Two 911 Calls (ECF Doc. 117)**

On January 30, 2020, the government filed a motion *in limine* seeking to introduce two 911 calls to TPD operators. The calls were made by bank employees during the robbery and immediately after the robbery. One call was made by an employee, C. V., who was in the break room at the time of the robbery when he heard the flicker sound of the silent alarm. He looked up and saw on the bank's closed circuit television, one of the teller's putting money into the robber's bag. He proceeded to call 911 reporting what he saw and also what he was seeing as he stepped out the back door of the bank in hopes of seeing the robber and which direction he took.

The second call was made by the bank manager who facilitated the call for one of the bank tellers, who was too distraught to speak or make the call herself. The bank manager told the 911 operator that the teller was "shaking and can't speak". The bank manager then turned the call to the teller who was able to speak. The bank manager told the teller to "just breathe" and helped her calm down so that the teller could speak. The two are heard in the one 911 call.

The government seeks to introduce the two calls as admissible evidence under the hearsay exceptions of present sense impression, excited utterance, and then-existing mental, emotional, or physical condition. All of the statements are clearly present sense impressions and excited utterances. The call from C. V. is occurring while he is watching the robbery occur and as he is maintaining contact with the operator throughout the robbery and well into the robber's getaway. Essentially, C. V. provided a play-by-play account of the defendant's actions. C. V. would have no chance to reflect upon what he is reporting,

thus the information is contemporaneous to the call, and the call is highly relevant as it describes the robbery and getaway. Thus, his statements are excited utterances and present sense impressions.

The statements from the bank manager and from the bank teller are excited utterances, present sense impressions, and statements of then-existing mental, emotional or physical condition. The call was made soon after the robbery occurred. The bank teller was too distraught to make the call herself. The bank manager initiated the call and described the mental, emotional and physical state of the teller. The manager informed the 911 operator that the teller was unable to speak and was shaking. All of this is heard on the call itself. The teller was eventually able to speak to the operator. This recording was made contemporaneously, with little or no chance for reflection and is exceptionally relevant to the elements of the crime charged.

The limits of the Confrontation Clause do not apply, as the declarants are all present and available for cross-examination. Thus, all of the recordings are admissible under the law, and are material and highly probative. The probative value of the calls are not substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence. No opposition motion was filed.

**G. Defendant's Motion *In Limine* Requesting That The Jury Be Informed of Mr. Kreb's Physical Limitations (ECF Doc. 121)**

On February 3, 2020, the defendant filed a motion *in limine* requesting the jury be informed of the defendant's physical limitations. The government opposed the motion. The defendant requests that the Court, before trial, instruct the jury regarding the defendant's speech patterns, hearing issues, and fatigue. The defendant's request does nothing to assist the jury in examining and evaluating evidence presented. The requested instructions would be to incite emotion – specifically, sympathy for the defendant. Such a requested instructions is, in essence, requesting the full force of the Court to get behind these claims. This is an improper manner of encouraging the jury to give the issue more

weight than that which they are entitled. Moreover, the defendant has provided no support in fact or in law for such request. The defendant provides no medical support to demonstrate that he, in fact, has any such defects.

This motion is set for argument on February 24, 2020.

**H. Defendant's Motion *In Limine* Regarding Mr. Kreb's Trial Clothes (ECF Doc. 122)**

On February 3, 2020, the defendant filed a motion *in limine* regarding the defendant's trial clothes. The government opposed the motion. The defendant has requested that he be allowed to wear his trial clothes during trial. Although the defendant maintains the right **not** to be forced to wear jail attire in front of a jury, the reverse, requiring the defendant to wear everyday attire does not implicate Due Process. The defendant has provided authority only against wearing jail clothes, and not in favor of allowing them. The government maintains that allowing the defendant to wear jail clothes under the circumstances of this case would be prejudicial to both the defendant and the government. The defendant is being tried for an offense that occurred more than two years ago. Seeing the defendant in jail attire would necessarily cause the jury to deduce that the defendant has been in custody for more than two years, awaiting trial. This could prejudice the defendant by allowing the jury to infer that he would only be imprisoned for this length of time if he were guilty. In turn, this length of time in custody, combined with the defendant's advanced age, use of a wheelchair, and other age-related characteristics could cause the jury to sympathize with the defendant and lead to a greater risk of nullification. The government, and the public, have a compelling interest in a just and fair trial, and this is not outweighed by the defendant's preferences.

This motion is scheduled for argument on February 24, 2020.

**VI. STIPULATED JURY INSTRUCTIONS (ECF Doc. 139)**

The government filed stipulated jury instructions on February 18, 2020. They are preliminary, mid-trial, and final jury instructions.

**VII. CONCLUSION**

This brief is offered to acquaint the Court with factual and legal issues that may arise at trial or prior thereto. The United States requests that the Court grant it leave to submit additional information should other issues emerge later.

Respectfully submitted this 19th day of February, 2020.

> MICHAEL BAILEY
> United States Attorney
> District of Arizona
>
> *s/ Raquel Arellano*
> *s/ Christine Melton*
>
> RAQUEL ARELLANO
> CHRISTINE MELTON
> Assistant U.S. Attorneys

Copy of the foregoing served electronically or by other means this 19th day of February, 2020, to:

J. Leonardo Costales, Esq.
Gregory Berger, Esq.